Filed 9/9/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B329575 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC680425) |
| v. | |
| ADIR INTERNATIONAL, LLC, et al., | |
| Defendants and Appellants. | |

APPEALS from judgment of the Superior Court of Los Angeles County. Steven J. Kleifield, Judge. Affirmed in part; reversed and remanded in part.

Rob Bonta, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen, Alicia K. Hancock, Michael Reynolds and Rosailda Perez, Deputy Attorneys General, for Plaintiff and Appellant.

Eugene Kalinsky for the California Department of Insurance and Ricardo Lara, Insurance Commissioner of the State of California, as Amicus Curiae on behalf of Plaintiff and Appellant.

Seth E. Mermin, David S. Nahmias and Erin Kramer for UC Berkeley Center for Consumer Law & Economic Justice, Bet

Tzedek Legal Services, and Public Counsel as Amici Curiae on behalf of Plaintiff and Appellant.

O'Melveny & Meyers, David L. Kirman and Anton Metlitsky for Defendants and Appellants.

_____

The People of the State of California brought a civil enforcement action against defendant Adir International, LLC (Adir) and its owner defendant Ron Azarkman, alleging that their sale of account/credit protection services and credit property insurance violates Business and Professions Code section 17200, the unfair competition law (UCL). As called for in actions under the UCL, the People alleged predicate violations of law—here the Insurance Code and the Unruh Retail Installment Sales Act, Civil Code section 1801 et seq. (Unruh Act).

After a bench trial, the trial court found Adir had violated the UCL by committing predicate violations of the Insurance Code in selling its credit property insurance. The trial court found Azarkman personally liable as well. The trial court found, however, that defendants' sale of account/credit protection services did not violate the Unruh Act. All parties appeal from the judgment.

We affirm in all respects the trial court's finding that Adir and Azarkman committed violations of the Insurance Code. We reverse the trial court's finding that their sale of account/credit protection services is not barred by the Unruh Act, and remand for further proceedings on the Unruh Act allegations.[1]

_____

[1] We grant the People's unopposed motion for judicial notice and supplemental motion for judicial notice of various documents evincing the history of the Unruh Act and later amendments.

## BACKGROUND

Adir operates a chain of retail stores under the name Curacao. Curacao sells electronics, appliances, furniture, and home goods in its stores in California, Nevada, and Arizona. Curacao's core customers are recent, low-income Spanish-speaking immigrants who have poor credit or no credit history and so cannot get credit elsewhere.

Curacao acts as a retail creditor, offering store credit to its customers. More than 90 percent of Curacao's sales are to customers who buy on Curacao's store credit. Beginning at least as early as 2012, Curacao offered credit to its California customers in the form of retail installment *accounts* and retail installment *contracts*. Curacao's retail installment accounts are revolving accounts, like credit card accounts, that accrue finance charges monthly based on the unpaid balance. Curacao's retail installment contracts are fixed length, fixed-payment contracts, similar to the arrangements many consumers use for vehicle purchases. Finance charges are computed at the time of the purchase and spread evenly over the term of the installment payments. Curacao stopped offering retail installment contracts around July 2020, but continues to offer retail installment credit accounts.

In 2006, Curacao began offering consumers optional "account protection," known as "Adir Global Protection" or "AGP," on both retail installment accounts and retail installment contracts.[2] Adir offered two forms of AGP: AGP Basic and AGP Plus. AGP Plus includes the benefits of AGP Basic and also includes a credit property insurance policy underwritten by a third party that provides product replacement coverage. (Hereafter, "AGP" refers to the account protection coverage provided by both AGP Basic and AGP Plus; "AGP Plus" refers to the credit property insurance portion of AGP Plus.)

At all times relevant to this action, Curacao was licensed as a credit insurance agent by the California Department of Insurance. Each year it registered each of its *store managers* as "endorsees" under its credit insurance license and renewed both its license and the registration of its endorsees. Curacao *sales associates* were *not* endorsees but were eligible to receive a $2 "bonus" for selling AGP Basic, and a $1 "bonus" for upgrading a customer from AGP Basic to AGP Plus.

Under the AGP program, consumers pay a monthly fee on each enrolled account or contract in exchange for the ability to "activate" AGP and defer their installment payments if a "qualifying event" such as unemployment or disability occurs. In

---

[2] For most of the relevant time period, this account protection was marketed as "Adir Global Protection" or "AGP." It was rebranded as "Curacao Credit Shield" or "CCS" in 2020. We use AGP to refer collectively to AGP and CCS.

some uncommon circumstances the payments can be cancelled entirely.[3]

If activation is approved and payments are deferred, Curacao does not charge a $10 late payment fee on the enrolled account or contract for each month of deferred payments. For retail installment accounts, Curacao also does not charge a finance charge on the enrolled account during the months of deferral. AGP payment deferral does not reduce a consumer's outstanding account balance with Curacao, and when the deferral ends, consumers must resume their regular monthly payments.

If deferral has been activated, Curacao still charges the applicable AGP fee every month on each retail installment agreement enrolled in AGP with an outstanding balance. These fees vary with the outstanding balance and, at the time of trial, ranged from $4.95 to $16.95 per month, per account or contract. Consumers can have multiple accounts and contracts enrolled in AGP, so a consumer might be paying multiple AGP fees at once.[4] These multiple fees for AGP can add up, costing more to consumers than they would pay if their balance were on a single

---

[3]    Almost all AGP activation requests approved by Curacao have been for payment deferral, not cancellation. The trial court found that for fiscal years 2016–2018, more than 99 percent of approved AGP activations were for deferments.

[4]    AGP attaches to Curacao's own retail installment accounts and contracts only. Customers who purchase goods or services from Curacao with bank-issued credit cards cannot enroll in AGP.

account.  Consumers may also end up paying more in AGP fees than they pay in finance charges on those accounts.

Curacao customers are not required to purchase AGP or AGP Plus to obtain credit.  Both services can be cancelled at any time.  Until December 2020, customers purchasing AGP and AGP Plus received their contracts and disclosures in printed form after they agreed to the transactions.  In December 2020, Curacao transitioned to a contactless process.  Enrollment became available on tablets and smartphones.

The trial court found "AGP was profitable to the tune of $83,591,688 for the period May 20, 2012 through January 2022." However, "the total AGP benefits provided to consumers between February 2012 and January 2022 was approximately $2,245,403," or about 2.7 percent of the AGP fees charged.  As the trial court found: "While the stated purpose of AGP . . . is to protect customers' credit, it primarily serves to protect [Curacao] against defaults.  [Curacao] is able to give credit to the uncreditworthy at prevailing rates because of the profitability of AGP.  Customers who choose to purchase AGP may benefit, but overall AGP greatly increases the cost of borrowing for those who choose to purchase it.  Conversely, because many customers purchase AGP, [Curacao's] target customers are able to obtain credit and purchase consumer goods they would otherwise not be able to purchase due to their poor credit."

In October 2017, the People filed this action alleging Adir violated the UCL by making false and misleading statements in violation of Business and Professions Code section 17500 and committing a variety of predicate violations of other laws.

In May 2019, the People sought leave to amend their original complaint to add allegations that defendants violated the

Unruh Act and Insurance Code through their sale of AGP Basic and AGP Plus. Although Adir initially opposed such leave, it ultimately stipulated to allow the People leave to file their amended complaint in this action, which was filed on February 19, 2020.

On March 9, 2021, the parties agreed to a partial settlement, which the trial court entered as a Partial Judgment and Permanent Injunction. The Partial Judgment resolved the People's claims from their original October 2017 complaint, but reserved for trial all allegations that defendants violated the UCL through predicate violations of the Unruh Act and Insurance Code related to the sale of AGP Basic, AGP Plus, and other insurance.

On August 9, 2022, shortly before trial on the reserved UCL claims, the parties stipulated to 31 undisputed facts, so as to "streamline trial."

On September 28, 2022, a bench trial on the People's reserved claims began. In addition to the stipulated facts, the People presented discovery responses, documents, and witness testimony to prove Adir and Azarkman had violated the Unruh Act and Insurance Code between 2012 and 2022.

On October 18, 2022, at the close of evidence, defendants moved for judgment in their favor. With respect to the Insurance Code allegations, they argued for the first time that the Insurance Code allegations should be stayed or dismissed under the primary jurisdiction doctrine. The trial court denied the motion.

On January 30, 2023, the trial court issued its final Statement of Decision, ruling in favor of Adir and Azarkman on the Unruh Act allegations, but finding they had violated multiple

7

provisions of the Insurance Code.  The trial court held Azarkman directly liable for Adir's Insurance Code violations because he had complete control over Curacao's insurance sales practices that violated the Insurance Code, was aware of those practices, and permitted them to continue.

The trial court assessed civil penalties under the UCL against both Adir and Azarkman for their violations of the Insurance Code.  The trial court found that each credit insurance policy sold by Curacao constituted a separate violation of the UCL based on the Insurance Code, for a total of 318,807 UCL violations.  The trial court awarded $25 per violation of the UCL.  The total penalty awarded for the 318,807 UCL violations was $7,970,175.

Adir and Azarkman then filed a motion for a new trial contending that the UCL's four-year statute of limitations barred violations occurring before February 19, 2016.  The trial court denied the motion, finding they had waived their statute of limitations defense by stipulating at trial that "the relevant period for the People's claims begin[s] May 20, 2012."

These appeals by the People and by Adir and Azarkman followed.  We begin with Adir and Azarkman.

## DISCUSSION OF APPEALS BY ADIR AND AZARKMAN

Practices actionable under the UCL include anything that can properly be called a business practice and that at the same time is forbidden by law.  (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 (*Farmers*).)  The UCL authorizes lawsuits to remedy unlawful conduct even if the underlying statute rendering the conduct unlawful does not itself create an independent right of action.  (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 561–567.)  Duplicate

8

enforcement by both public prosecutors and administrative agencies is authorized: a UCL action by law enforcement does not preclude a later administrative proceeding against the same defendant concerning the same conduct, and an administrative proceeding does not preclude a later law enforcement action under the UCL. (*Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237, 1250 (*Blue Cross*).) Indeed, even if the underlying statute that renders the conduct unlawful expressly authorizes a particular agency to enforce the statute but does not include a parallel authorization of suits by local law enforcement offices, those officials can still sue under the UCL for violation of the statute. (*Ibid.*; *People v. McKale* (1979) 25 Cal.3d 626, 632–633.)

Adir and Azarkman contend the trial court erred in three ways. "First, this specialized insurance matter should not have been in court at all: under the doctrine of primary jurisdiction, the Commissioner of Insurance should have considered the issues in the first instance in an administrative forum. Second, the court misconstrued and misapplied the three Insurance Code provisions it found that Curacao violated. Third, the trial court should not have permitted the State to make its case based on time-barred allegations." Defendants additionally contend the trial court erred in holding Azarkman personally liable for the violations. We find no error. [5]

---

[5] Undesignated statutory references are to the Insurance Code.

9

## I.    *Doctrine of Primary Jurisdiction*

The doctrine of primary jurisdiction " 'comes into play whenever enforcement of the [plaintiff's] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Farmers*, *supra*, 2 Cal.4th at p. 390.)  The doctrine thus applies to claims properly cognizable in court that include some issues within the special competence of an administrative agency.  It requires the court to enable a "referral" to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.  (*Wise v. Pacific Gas & Electric Co.* (2005) 132 Cal.App.4th 725, 740.)  The doctrine is subject to a futility exception: "[I]t is improper to invoke the primary jurisdiction of an administrative agency if it is clear that further proceedings within that agency would be futile."  (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 936 (*Jonathan Neil*).)

Defendants initially claim that under the doctrine of primary jurisdiction this matter should never have been in court at all and should have been considered "in the first instance" by the Insurance Commissioner.  Adir did not raise the issue of primary jurisdiction until after the close of evidence.  Thus, defendants are reduced to arguing that the trial court, after trial, should have stayed the claims alleging Insurance Code violations and given the Insurance Commissioner the opportunity to act.

A trial court's ruling on the primary jurisdiction doctrine is reviewed for abuse of discretion.  (*Blue Cross*, *supra*, 180 Cal.App.4th at p. 1260.)  Generally, a trial court abuses its

10

discretion if it rules " ' "in an arbitrary, capricious or patently absurd manner that result[s] in a manifest miscarriage of justice." ' " (*People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 352.)

Defendants contend that in deciding to decline to apply the primary jurisdiction doctrine, the trial court "simply reasoned that whether to defer to an expert agency's 'primary jurisdiction' is a 'matter of discretion.' " Relying on *Farmers* and *Jonathan Neil*, they argue an abuse of discretion occurs when a trial court declines to defer to an expert agency where, as here, the issues squarely implicate that agency's expertise. Further, where an agency's expertise is implicated, the trial court may not use "judicial economy" as a ground not to defer.

Defendants misstate the record on appeal. They have cited only the trial court's summary of a lengthy discussion of the primary jurisdiction doctrine. In its summary, the court clearly was relying on factors other than its discretion and judicial economy. The court expressly referred to "judicial economy and the other factors that were discussed."

The trial court in fact discussed and distinguished *Farmers*. Defendants do not address the trial court's finding that the question of rate-setting in *Farmers* is fundamentally different than the questions raised by this action. In addition, the trial court discussed, as defendants do not, the apparent decision of the Insurance Commissioner to assist the Attorney General in the prosecution of this lawsuit, and to forbear from bringing an enforcement action of his own during the pendency of this action in the trial court. This is an important factor as it implicates the futility doctrine: If the Commissioner supported the Attorney General in its law enforcement action, there was no point in

11

referring the matter back to the agency so it could exercise its expertise. That expertise was on display and available to the court throughout the pendency of the action.

Because defendants do not acknowledge the trial court's full ruling, they cannot offer a cogent argument supporting their claim that the trial court's specific ruling was an abuse of discretion. Defendants merely argue the facts of this case are indistinguishable from those of *Farmers* and *Jonathan Neil* and the similarity of the cases compels a finding that the trial court erred here.

Defendants' own argument shows the facts are distinguishable. They contend that "as in *Farmers* and *Jonathan Neil*, the Insurance Code provides for a 'pervasive and self-contained system of administrative procedure' that could have been invoked instead of a UCL suit. (*Farmers*, *supra*, 2 Cal.4th at p. 396.) Under [s]ection 1758.95, the commissioner is empowered to take a number of remedial steps when he finds a violation of the Insurance Code. Those measures include suspending or revoking a credit insurance agent's license (§ 1758.95, subd. (a)(1)-(2), imposing fines, (*ibid*.) and issuing cease and desist orders (§ 1758.95, subd. (b))."

The specific issue before the Supreme Court in *Farmers* was the validity of certain insurers' rate-setting practices. The Supreme Court referred to the " 'pervasive and self-contained system of administrative procedure' " (*Farmers*, *supra*, 2 Cal.4th at p. 396) in section 1858 which "establishes an administrative scheme under which '[a]ny person aggrieved by any rate charged, rating plan, rating system, or underwriting rule . . . may' file a complaint with the Insurance Commissioner." (*Farmers*, at p. 384.) Subsequent sections set out procedures in detail for the

12

Insurance Commissioner's investigation and resolution of the rate-setting complaint.  (*Id*. at pp. 384–385.)

The issue in *Jonathan Neil* similarly involved a complaint about insurance premiums and a " ' "pervasive and self-contained system of administrative procedure" ' ([*Farmers*], *supra*, 2 Cal.4th at p. 396), in the form of an assigned risk program heavily regulated and indeed ultimately governed by the Commissioner." (*Jonathan Neil*, *supra*, 33 Cal.4th at p. 934.)

The issues here do not call upon the "pervasive and self-contained system of administrative procedure" implicated by rate challenges and the setting of insurance premiums, issues which are heavily regulated by the Department of Insurance as described in *Farmers* and *Jonathan Neil*.  Here the trial court was called upon to interpret particular phrases in the Insurance Code.  Statutory construction, a bedrock of judicial tasks, is hardly an area where the trial court must defer to administrative agencies.  Defendants' argument to the contrary borders on the frivolous, which is demonstrated by their failure to raise the issue until after they had gambled on the outcome of a bench trial and faced an adverse judgment in the trial court.

Another more significant flaw in defendants' arguments is that they fail to address the decision of the Insurance Commissioner to assist the Attorney General in this action. Defendants do not mention this anywhere in their opening brief. Although we do not normally consider arguments made for the first time in a reply brief (*Owens v. City of Oakland Housing, Residential Rent & Relocation Bd.* (2020) 49 Cal.App.5th 739, 746 (*Owens*)), we note defendants claim in reply that the Insurance Commissioner's failure to file an amicus curiae brief has

13

probative value in our analysis of this issue.[6]  This prompted the Insurance Commissioner to file an amicus curiae brief noting "Defendants' reply brief further inexplicably urges this [c]ourt to make assumptions based on the fact that 'the Department did not file an amicus curiae brief opposing application of the primary-jurisdiction doctrine.' "[7]  The Insurance Commissioner continued: "[T]he unique facts of this case obliterate any need for a primary jurisdiction referral.  Here, the trial court correctly found [the Department of Insurance] had been cooperating with the People throughout the life of the case, finding '[i]t was apparent at trial . . . that the Department of Insurance was assisting the Attorney General's Office in obtaining an expert witness.' "

Ignoring the first rule of holes,[8] defendants then filed a separate brief to attack the Insurance Commissioner's amicus curiae brief for failing to "take any position on the merits of any of the Insurance Code questions at issue" on appeal.  "The

---

[6]     Defendants claim the Department of Insurance did not file an amicus curiae brief in this case as it had in other cases.  The plural is not supported by any evidence or legal authority.  Defendants cite one case in which an amicus curiae brief was filed.  This is hardly a pattern.

[7]     As the Department of Insurance points out, California Rules of Court, rule 8.200(c)(1) provides applications for permission to file amicus curiae briefs may be filed within 14 days after the reply brief is required to be filed.  Accordingly, there would be no basis for an amicus curiae brief to be filed before the close of briefing by the parties.

[8]     "When you are in a hole, stop digging."  (Apperson, The Dict. of Proverbs, Wordsworth Collection (2006) p. 283, col. 1.)

14

Insurance Commissioner's silence is deafening—if the Commissioner agreed with the State's reading of the Insurance Code, he presumably would have informed the [c]ourt of that fact." We are not aware of any presumption in the law that silence on an issue in an amicus curiae brief signifies a particular position taken by amici curiae. The Insurance Commissioner explained his limited purpose in filing an amicus curiae brief. He had and has no obligation to comment on this case at all. Defendants' suggestions to the contrary are not well taken.

Given the Insurance Commissioner's involvement in the litigation and the nature of the Insurance Code violations alleged, the trial court did not abuse its discretion in declining to stay the action and refer the matter to the Insurance Commissioner.

II.   ***Insurance Code Violations***

Defendants contend the trial court misconstrued and misapplied three Insurance Code provisions it found they had violated. Defendants identify these three provisions as sections 1758.98, 1758.93 and 1758.97.

Defendants' claims involve questions of law and the application of law to undisputed facts, and so we review them de novo. (*People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 518 (*Ashford Univ.*).) We see no error.

A.    Unauthorized Seller (Section 1758.98)

Defendants paid their employees a "bonus" for each AGP Basic and AGP Plus product the employee sold. The parties stipulated that employees received a $1 bonus for upgrading a customer from AGP Basic to AGP Plus. It is undisputed AGP Plus had an insurance component, specifically credit property insurance. It is also undisputed the sales employees at issue

15

were not licensed to sell insurance and were not endorsees under Curacao's license.

During the time period relevant to this action, the Insurance Code prohibited a credit insurance agent such as Curacao from paying "any unlicensed person any compensation, fee, or commission dependent on the placement of insurance under the agent's license." (§ 1758.98, subd. (c); see also § 1758.9 ["No person shall sell or solicit any form of credit insurance in this state unless that person is licensed as an insurance agent or broker pursuant to Article 3 (commencing with Section 1631) or is licensed as a credit insurance agent or endorsee under this article."].) The Insurance Code also provided: "No person shall sell or solicit any form of credit insurance in this state unless that person is licensed as an insurance agent or broker pursuant to Article 3 (commencing with Section 1631) or is licensed as a credit insurance agent or endorsee under this article." (§ 1758.9.)

The trial court found defendants violated sections 1758.9 and 1758.98, subdivision (c), "by selling credit property insurance to California consumers through employees who were not individually licensed to sell insurance and not endorsed under Curacao's credit insurance agent license, and who were paid commissions for selling that insurance."

Defendants contend the trial court erred in finding the $1 bonus paid to employees for upgrading a customer's plan from AGP Basic to AGP Plus was a "commission." We disagree.

California regulations specify: " 'Commission' means any tangible or intangible thing of value, the existence, size, quality or quantity of which depends on the quantity or value of credit insurance solicited, sold, or enrolled by the person receiving the commission. 'Commission' does not include salary paid to an

16

employee of a creditor who sells, solicits, or enrolls, as long as the amount of the salary does not depend on the quantity or value of credit insurance solicited, sold, or enrolled by the employee." (Cal. Code Regs., tit. 10, § 2192.3, subd. (e).)

The trial court found: "A $1 bonus for AGP Plus was paid for each policy the employee sold, so it 'depends on the quantity . . . of credit insurance' sold or enrolled by the employee. (*See* Stipulated Fact No. 20; Ex. 333.0011, .0016 [Curacao Sales Associates Compensation Plan—Management Guide].) The tiered bonus for separate credit property insurance 'depends on the . . . value of credit insurance' sold or enrolled by the employee. (*See* Stipulated Fact No. 21; Ex. 333.0011, .0016.) Each bonus is a 'commission' under the Department of Insurance's regulations."

Relying almost entirely on dictionary definitions of the words "quantity" and "value," defendants claim the term "commission" can only refer to the dollar amount of insurance policies sold, not the number of policies sold. According to defendants, "quantity" means "[t]he amount of something measurable." (Black's Law Dict. (12th ed. 2024) p. 1500, col. 2.) "Value" means "[t]he monetary worth or price of something; the amount of goods, services, or money that something commands in an exchange." (*Id*., at p. 1870, col. 2.) Defendants then jump to a nonlegal source, contending that the word "amount" is usually used with "mass nouns," like describing "an increase in the amount of litigation"—whereas "number" is used with count nouns, like describing a "number of lawsuits." (Garner, Garner's Modern American Usage (3d ed. 2009).) Based on this suggested usage of the word "amount," defendants contend the phrase "quantity or value" must therefore refer to the amount of credit

17

insurance sold, not to the number of insurance policies sold. By amount of insurance, defendants mean the dollar amount of the coverage provided by the policy.

There are several flaws with this argument. The primary flaw is that the California regulation does not use the phrase "amount of insurance." Defendants, however, rely on cases using the specific phrase "amount of insurance" to support its claim that the phrase "quantity of insurance" in the regulation refers to the dollar amount of coverage. They cite cases using the phrase "amount of insurance" to show it is a well understood term in California insurance law and is used to refer to the dollar amount of coverage provided by a policy. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 779, fn. 2 ["minimum amounts of insurance"]; *In re Hardy* (2007) 41 Cal.4th 977, 985 ["unusually large amount of life insurance"].) That may be so, but the Department of Insurance did not choose to use the word "amount" in the regulation defining "commission." Defendants have not cited, nor are we aware of, any California case using the phrase "quantity of insurance," let alone using it to refer to the dollar amount of coverage provided by an insurance policy.

Perhaps to reinforce their attempt to insert "amount" into the regulation, defendants also point to that portion of the definition of "value" which uses the word "amount." This does not strengthen their argument. Treating the words "quantity" and "value" as both meaning "amount" is contrary to at least three different rules of statutory construction. It would make one of the two words surplusage, would give different words in the same statutory scheme the same meaning and would not provide the alternatives suggested by the use of the disjunctive. "It is a

18

settled principle of statutory construction that courts should 'strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous.' " (*In re C.H.* (2011) 53 Cal.4th 94, 103.) "When the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings." (*Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1343; see *Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 565 [it is "our obligation to interpret different terms used by the Legislature in the same statutory scheme to have different meanings"].) "Additionally, the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories. [Citation.] The word 'or' suggests alternatives." (*In re E.A.* (2018) 24 Cal.App.5th 648, 661; *Bates v. Poway Unified School Dist.* (2022) 83 Cal.App.5th 907, 926.)

In sum, defendants claim that "quantity or value" must refer to the dollar "amount" of coverage, and where, as here, the employee bonus is not dependent on the dollar amount of coverage provided by a policy, the bonus is not a payment. We reject this claim.

Another significant flaw in defendants' dictionary-based argument is that it considers only part of Black's Law Dictionary's definition of "quantity." We are not bound by Black's Law Dictionary however useful it may be on occasion, but if we were to consult it, we would look at the full definition of "quantity." Black's Law Dictionary defines "quantity" as "the ascertainable number of countable things" or "[a] large amount *or number* of something." (Black's Law Dict., *supra*, p. 1500, col. 2, italics added.) Using this definition, "quantity of insurance"

19

would read "the ascertainable number of countable things of insurance." It is then reasonable to understand quantity of insurance to mean the number of insurance policies sold, as a policy is a countable thing.

For this same reason, defendants' grammar-based argument that "insurance" is a "mass noun[]" is similarly unpersuasive. They note that one does not say one has "one insurance" or "ten insurances." We agree, but do not find this helpful. As we have just noted, the individual units of a quantity of insurance can be counted with numbers. This does require some specification of the kind of numerical units used to measure the mass noun. The description of the unit could be the dollar amount of coverage *or* number of policies. Put differently, in order for "quantity of insurance" to refer to the dollar amount of coverage as defendants contend, one must at a minimum add a word or symbol specifying a currency unit ($10,000 insurance) or, more normally, use additional words ($10,000 in insurance coverage or $10,000 worth of insurance). We see no logical reason that one could add words to "10,000 insurance" to show that the quantity referred to is the dollar amount of coverage but not add a word to show the quantity referred to is the number of policies (10,000 policies).

To the extent the phrase "quantity or value of credit insurance" is ambiguous, we look to the meaning which would best effectuate the Legislature's intent. (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265 (*Cornett*).)

The parties essentially agree that the Legislature was concerned with preventing "misrepresentation, fraud and abuse, [which arose] because of minimally trained sales personnel aggressively selling high profit products on commission or other

20

compensation incentive plans.  The result is that consumers often overpay for an insurance product that may duplicate existing insurance coverage."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 393 (1999–2000 Reg. Sess.) as amended Sept. 7, 1999, p. 8.)

Based on the above excerpt, defendants contend the Legislature's "concern was salespeople pushing high-dollar policies.  For two reasons the flat-rate bonuses here do not pose these acute risks that the Legislature sought to prevent.  First, the bonus itself is de minimis—a $1 bonus per policy does not create any significant incentive at all to push consumers into policies they do not want.  Second, and in any event, because the amount of the bonus is the same regardless of the size of the policy sold, the bonus does not create the same incentives for an employee to push a buyer into purchasing 'high profit,' potentially duplicative insurance products."  (Italics omitted.)

The statement by the Legislature refers to "high profit" policies.  Defendants do not point to any evidence in the record that only high dollar policies constitute high profit insurance products.  Selling a very large number of small dollar amount policies that seldom pay out could easily be as profitable as selling a small number of high dollar amount policies that pay out quickly.  We do not know, because there is no evidence on this point in the record.  We do know that the trial court found AGP (with its small dollar policies and small dollar bonuses) as a whole highly profitable for defendants.

Building on its unproven theory that high profit means high dollar coverage, defendants claim the flat-rate nature of the bonus would not push any employees into selling higher dollar amount policies.  They do not explain how its employees would

21

have the option to offer a higher dollar amount of coverage. The parties stipulated that "To purchase AGP, a consumer pays a monthly fee that is determined by the amount of the consumer's outstanding credit balance." Put differently, the dollar amount of the insurance available is determined by the customer's credit balance. The only "increase" in possible coverage appears to be the one for which the $1 payment is in fact made: the upsell from AGP Basic to AGP Plus (which adds credit property insurance). While the customer's payment is still based on the dollar amount of the customer's credit balance, the payments for AGP Plus are higher than for AGP Basic. A flat-rate bonus works in a situation like this, where the customer has only one option: purchasing or not purchasing credit property insurance.

Defendants also attack the $1 payment as "de minimis," contending it would not create an incentive for employees to sell insurance. If that is the case, defendants do not explain why it offered the payment in the first place. We can think of no rational explanation other than incentivizing employees to sell insurance. We also do not accept that a $1 bonus is de minimis to defendants' employees. Adir has not pointed to any evidence in the record showing the compensation it paid its sales employees, and so we cannot conclude that $1 per sale would mean nothing to them. For example, if any of those employees made the 2023 California minimum wage of $15 per hour (Lab. Code, § 1182.12), an additional $1 would represent a 6.6 percent increase in his or her pay for that hour. What workers would scorn a 6.6 percent pay increase?

In their reply brief, defendants contend their interpretation of the statute's words does not result in surplusage. They contend for the first time that quantity and value can have

22

separate meanings. They maintain that quantity refers to the amount of coverage, but makes the new claim that value "could also refer [to] how much a policyholder pays for the policy." We generally do not consider arguments made for the first time in a reply brief.[9] (*Owens*, *supra*, 49 Cal.App.5th at p. 746.) We note, however, that this argument would not help defendants, because a commission may be based on quantity *or* value.

The total bonus an employee receives is based on the number of AGP Plus policies the employee sells. Specifically, it is $1 times the number of policies sold. The more policies an employee sells, the more the employee earns. Because each employee's bonus is based on an "ascertainable number" of

---

[9] To be clear, this was not the argument defendants made in their opening brief. We quote: "The phrase 'quantity or value' thus refers to the *amount* of credit *insurance* sold, not to the *number* of insurance *policies* sold. One does not have 'one insurance' or 'ten insurances.' One has an *amount* of insurance— say, $1 million of it. [Citations.] [¶] The flat-rate bonuses were not a commission because the size of the bonuses did not depend on the amount—that is, the quantity or value—of insurance sold. Irrespective of whether an employee sold a policy with $100 in coverage or $10,000 in coverage, the bonus was the same—a $1.00 for the upgrade to AGP Plus."

Defendants cited *People v. Reynoza* (2024) 15 Cal.5th 982 in their opening brief, and that case clearly mentions the "canon against surplusage" and the significance of using the disjunctive "or." (*Id*. at pp. 991–992.) Nevertheless, defendants made no effort to discuss either rule of statutory construction in their opening brief. We decline to allow them to sandbag their party opponent in reply.

23

insurance policies sold, defendants paid a commission that "depends on the quantity" of insurance sold.

B.    Compliance and Training (Section 1758.93)

The trial court found defendants violated section 1758.93 in two ways.  They did not register or endorse that their employees sold credit insurance and they did not use training materials approved by the Department of Insurance to train employees who sell credit property insurance on Curacao's behalf.  Instead, they used unapproved training materials.

Defendants contend the trial court erred in finding that they violated section 1758.93.  They argue it is undisputed they complied with the requirement of section 1758.93 to "provide training to each endorsee about the credit insurance products to be sold" and the requirement that the "[t]raining materials used by the organization to train endorsees" be submitted to and approved by the Department of Insurance on an annual basis. (§ 1758.93, subd. (b).)  They further contend they complied with the requirement of section 1758.93 that each "endorsee" sign an affidavit warranting that they have read the approved training materials.  (*Id*., subd. (a)(2).)

Defendants also claim the text of section 1758.93 imposes requirements on "endorsees," not on nonendorsees.  According to defendants, even if their sales employees should have been "endorsees," they were not in fact endorsees because they were not "endorsed on the license of the credit insurance agent." (§ 1758.94, subd. (b).)  They conclude there is no textual basis to impose liability on them under this provision.  They also accuse the trial court of "bootstrapping" a violation of section 1758.9 onto violations of section 1758.93: "[t]o hold that every violation of [s]ection 1758.9 is also a violation of [s]ection 1758.93, as the trial

24

court apparently concluded, would make no sense of the statutes' distinct purposes. And it would create impermissible statutory overlap, because the provisions would not 'reach[] some distinct cases' from each other. (*Connor*[ *v. First Student, Inc.* (2018)] 5 Cal.5th [1026,] 1038.)"

Defendants take much too narrow a reading of section 1758.93 and of the violations found by the trial court. The trial court's section 1758.93 discussion can be broken down into two parts; each part concerns a different violation of section 1758.93.

The first part is found under the trial court's heading "Curacao did not register or endorse its employees who sell credit property insurance with the Department of Insurance." (Boldface omitted.) Under this heading, the trial court begins its discussion by finding: "The evidence showed that Curacao did not register or endorse its employees who sell credit insurance under its license with the Department of Insurance, in violation of section 1758.93 of the Insurance Code and California Code of Regulations, title 10, section 2192.9. [¶] The Insurance Code allows an employee of a credit insurance agent to sell insurance under the agent's license if the employee has complied with the requirements of Insurance Code section 1758.93 to become an endorsee. (Ins. Code, § [1758].94, subd. (b).)"

The trial court next discusses the forms which defendants submitted to the Department of Insurance: "Curacao annually submitted forms to the Department of Insurance listing its endorsees and an 'Annual Certification of Endorsee Training' [(Certificate)] in which it certified that '[*n*]*o person other than an authorized employee sells or offers insurance on* [*Curacao's*] *behalf,*' and that '[a]ll authorized employees have completed the required training.' . . . However, the endorsees listed on those

25

forms were only Curacao's store and regional managers and did not include any sales associates, credit agents, or telemarketers who sell credit property insurance on Curacao's behalf. . . . Those employees are required to be licensed or endorsed to sell insurance under Curacao's license." (Italics added.) To be clear, although the trial court did not spell it out, this is a finding by the trial court that defendants' statement on the Certificate that only employees authorized by its license sold insurance on its behalf was false.

This statement in the Certificate that only authorized employees sold insurance was not superfluous. Section 1758.93, subdivision (b) requires the licensed organization to file an annual "statement of compliance with this *article*." (*Ibid*., italics added.) Section 1758.93 is found in Article 16.7 of the Insurance Code, entitled "Credit Insurance Agents (§§ 1758.9–1758.994)." Thus, this required compliance statement is not limited to training requirements.

Defendants did not and could not satisfy the requirement of section 1758.93, subdivision (b) because Curacao did not and could not file a valid statement of compliance. This is so because Curacao did permit unauthorized employees to sell insurance on its behalf. This is a violation of section 1758.93, subdivision (b).

The violation of falsely claiming that only authorized employees sell insurance is distinct from the violation of allowing unauthorized employees to sell insurance. "Any partial overlap between the statutes does not render one superfluous." (*Connor v. First Student, Inc.*, *supra*, 5 Cal.5th at p. 1038.)

The trial court's second section discussing section 1758.93 focuses on defendants' failure to train Curacao's unlicensed unendorsed employees, specifically its provision of unapproved

26

training materials to those employees.  This section is entitled: "Curacao did not use approved training materials to train its employees who sell credit property insurance."  (Boldface omitted.)

Defendants contend section 1758.93, subdivision (b) only imposes a duty to "provide training to each endorsee about the credit insurance products to be sold."  This is not a complete summary of an organization's training requirements.

An organization must provide training to employees *before* they can apply to become endorsees.  Section 1758.93, subdivision (a)(2) states: "The employee submits an application to the department that includes a signed affidavit, in a form prescribed by the commissioner, stating the applicant has read the credit insurance training material submitted to the commissioner and that the applicant *has received from the organization training* in, and is knowledgeable about, the credit insurance products to be sold, ethics, and market practices."  (*Ibid.*, italics added.)  Put differently, the purpose of this training is to prepare employees to sell insurance.

Section 1758.93, subdivision (b) describes permissible training materials: "Failure by a credit insurance licensee to submit training materials or changes for departmental review *or use of unapproved or disapproved training materials* shall constitute grounds for denial of an application for a license, nonrenewal of a license, or suspension of a license, as appropriate."  (*Ibid.*, italics added.)

Read together, section 1758.93, subdivisions (a)(2) and (b), require that even in training employees who are not yet endorsees, an organization must use approved training materials. There is nothing to suggest the Legislature intended this training

27

material requirement to apply only when an organization trains employees it intends to become endorsees. There is only one reason for an organization to train its employees to sell insurance: the organization intends for those employees to sell insurance on commission. Whether or not the employee ultimately applies to and does become an endorsee should not dictate the nature of the training, at least when the organization pays its employees to sell insurance on a commission basis. (And certainly, an organization's intent to violate the law by having those employees sell insurance without endorsement should not dictate the nature of the training.) Thus, all organizations which pay commissions to their employees when they sell insurance must train those employees according to the requirements of subdivision (b), using approved training materials.[10]

Permitting the use of unapproved training materials for employees the organization does not intend to become endorsees would be at least tacit approval of this illegal practice of allowing nonendorsees to sell insurance and have at least the potential to harm customers who purchase insurance from untrained sellers. Of course, if the organization deliberately or mistakenly does not require the trained employee to become an endorsee before

---

[10] It is true that during the period covered by this lawsuit, the term "commission" did not include employees who were paid a fixed salary regardless of the quantity or value of credit insurance sold and so those non-commissioned employees did not need to become endorsees in order to legally sell credit insurance. We need not and do not reach the issue of whether the Legislature intended for an organization to train its fixed salary employees using only approved training materials, as that situation is not before us and the law has since changed.

28

selling insurance, the organization has broken the law. But that violation would be worse if the organization has used unapproved training materials. Indeed, the primary difference between endorsees and nonendorsees is that endorsees have been properly trained to sell insurance.

### C. Late Disclosures (Section 1758.97)

The trial court made a detailed ruling on the disclosure claims: "The evidence showed that Curacao regularly failed to provide disclosures required by Insurance Code section 1758.97 to consumers before it enrolled those consumers in credit property insurance. [¶] Section 1758.97 prohibits a credit insurance agent from selling or offering to sell insurance unless two forms of disclosures are made, among other conditions. First, under sub[division] (a), the agent must provide brochures or written material that summarize the terms and conditions of the coverage, among other disclosures. (Ins. Code, § 1758.97, subd. (a).) Second, the agent must make several disclosures including: the insurance offered may duplicate the purchaser's other insurance coverage, and that the agent's endorsee is not qualified or authorized to evaluate the purchaser's existing coverages. (Ins. Code, § 1758.97, subd. (b).) The disclosures under sub[division] (b) must be made 'in a statement acknowledged by the purchaser in writing on a separate form, electronically, digitally, or by audio recording,' if the credit insurance 'is sold at the same time and place as the related credit transaction.' (*Ibid*.) All of the disclosures above 'must be printed and must be clear and conspicuous.' ([Cal. Code Regs., tit. 10], § 2192.6[, subd. ](a).) [¶] The evidence presented at trial demonstrated that Curacao's regular practice was to provide the disclosures required by section 1758.97, sub[division] (b), only

29

after the customer had already enrolled in AGP Plus or separate credit property insurance. . . . A customer being enrolled in AGP Plus or separate credit property insurance at a store would be asked to sign an electronic keypad without being shown the disclosures either in printed form or on a computer screen. . . . The insurance forms and disclosures would then be printed out with the customer's electronic signature printed on the forms. . . . The evidence showed that Curacao's computer sales system—the 'AR System'—did not display the credit insurance disclosures during the signature process, so a consumer could not view what they had signed until the insurance forms had been printed out with the customer's signature already appended. . . . [¶] Curacao's practice of providing the insurance disclosures required by section 1758.97, sub[division] (b), after the customer has enrolled in the coverage violates section 1758.97. The statute does not allow an agent to 'sell or offer to sell insurance' unless the agent 'makes the disclosures' under [section 1758.97, subdivision] (b). (Ins. Code, § 1758.97, subd. (b).) It is not permissible to provide these disclosures after the consumer has signed the contract and disclosures without seeing the terms, conditions, and disclosures that they signed."

Section 1758.97 provides in pertinent part: "A credit insurance agent shall not sell or offer to sell insurance pursuant to this article unless all of the . . . conditions [in subdivisions (a) through (e)] are satisfied." (*Ibid*.) Subdivision (a) of section 1758.97 requires the credit insurance agent to "provide[] brochures or other written materials to the prospective purchaser that [provide specified information]." (*Id*., subd. (a).) Subdivision (b) of section 1758.97 requires the credit insurance agent to "make[] all of the [specified] disclosures, either with or as part of

30

each individual policy or group certificate, or with a notice of proposed insurance, or, if the insurance is sold at the same time and place as the related credit transaction, in a statement acknowledged by the purchaser in writing on a separate form, electronically, digitally, or by audio recording." (*Id.*, subd. (b).)[11]

---

[11] Section 1758.97 provides in full:

"A credit insurance agent shall not sell or offer to sell insurance pursuant to this article unless all of the following conditions are satisfied:

"(a) The credit insurance agent provides brochures or other written materials to the prospective purchaser that do all of the following:

"(1) Summarize the material terms and conditions of coverage offered, including the identity of the insurer.

"(2) Describe the process for filing a claim, including a toll-free telephone number to report a claim.

"(3) Disclose any additional information on the price, benefits, exclusions, conditions, or other limitations of those policies that the commissioner may by rule prescribe.

"(b) The credit insurance agent makes all of the following disclosures, either with or as part of each individual policy or group certificate, or with a notice of proposed insurance, or, if the insurance is sold at the same time and place as the related credit transaction, in a statement acknowledged by the purchaser in writing on a separate form, electronically, digitally, or by audio recording:

Defendants contend the trial court erred because "[n]othing in the statutory language prohibits that contemporaneous transmission of the disclosures." They then point to the specific disclosure requirements of subdivisions (a) and (b) of section 1758.97. They claim: "The trial court's opinion does not analyze the statutory language at all, and thus cannot support the decision to impose liability under this provision."

It is defendants' burden as cross-appellants to show error on appeal. The trial court explained its understanding that the opening provision of section 1758.97 created a requirement that the disclosures precede the sale of the insurance. That opening

> "(1) That the purchase of the kinds of insurance prescribed in this article is not required in order to secure the loan or an extension of credit.
>
> "(2) That the insurance coverage offered by the credit insurance agent may provide a duplication of coverage already provided by a purchaser's other personal insurance policies or by another source of coverage.
>
> "(3) That the endorsee is not qualified or authorized to evaluate the adequacy of the purchaser's existing coverages, unless the individual is licensed pursuant to Article 3 (commencing with Section 1631).
>
> "(4) That the customer may cancel the insurance at any time. If the customer cancels within 30 days from the delivery of the insurance policy, certificate, or notice of proposed insurance, the premium will be refunded in full. If the customer cancels at any time thereafter, any unearned premium will be refunded in accordance with applicable law."

32

sentence provides: "A credit insurance agent shall not sell or offer to sell insurance pursuant to this article unless all of the . . . conditions [in subdivisions (a) through (e)] are satisfied." (*Ibid.*)

In their opening brief, defendants focus on subdivisions (a) and (b) of section 1758.97 and do not discuss the language of the first sentence of the section at all. They focus on the wrong part of section 1758.97. The key sentence of this section is the first sentence: "A credit insurance agent shall not sell or offer to sell insurance pursuant to this article unless all of the following conditions are satisfied." (*Ibid.*) Subdivisions (a) and (b) are simply two of the conditions which must be satisfied.

Defendants do not explain how the trial court erred in finding that the word "unless" created a precondition. Further, the substance of subdivisions (a) and (b) of section 1758.97 do not support defendants' argument. The specified conditions in those subdivisions involve information which would be relevant for the purchaser to consider *before* making a decision about whether to purchase the product. If anything, the substance of those two subdivisions supports the interpretation that the provision of information and disclosures is a precondition to the sale of insurance, not some action taken afterwards to validate the sale.

Defendants also fail to explain how a contemporaneous exchange could be achieved. Handing or sending the disclosure information to the prospective customer at the same time the agent begins the sales pitch is unworkable and violates the spirit of the condition. Perhaps rare individuals can devote their full attention to both listening to an agent's oral sales pitch and reading a multi-page disclosure document at the same time, but there is no reason to believe the Legislature wrote this section with such individuals in mind. For the average consumer, if the

33

sales pitch and the disclosures are to have any effect at all, one must precede the other.  Either the customer will listen to the sales pitch and then read the disclosures afterwards, or read the disclosures and hear the sales pitch afterwards, if at all.  In any event, the actual sales transaction of the product cannot precede or occur simultaneously with the required disclosures.

Given defendants' failure to support or explain their contentions, we find they have waived their claim of error. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 (*United Grand*) [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis' "].)

Because our review is de novo, we nevertheless consider this claim and find that the key word in this first sentence is the subordinating conjunction "unless."  "Unless" is a subordinating conjunction, the meaning of which can derive from the context in which it is used.  When the independent clause is negative, "unless" often turns the subordinated clause into a precondition for the occurrence of the clause.  "A customer cannot rent a car unless he or she has a driver's license" creates a precondition for renting the car: one must have acquired the license before renting the car.  One cannot rent the car and then go obtain a driver's license.  Thus, in section 1758.97, satisfaction of the subdivisions (a) and (b) requirements is a precondition to a permissible sale of credit insurance.

In reply, defendants belatedly contend that "unless" always means "except on the condition that" and further contend that the condition in the subordinate clause may occur contemporaneously with the event in the independent clause.  Thus, in their view, an agent may satisfy section 1758.97 by

34

"contemporaneous transmission" of the disclosures. We do not consider arguments made for the first time in a reply brief. (*Owens*, *supra*, 49 Cal.App.5th at p. 746.)

We also note that for the first time in their reply brief, defendants contend that purchasers receiving the disclosures "contemporaneously to signing their contracts" makes sense for the customers because they "can review the disclosures at [their] leisure and 'cancel the insurance at any time,' with 'the premium [to] be refunded in full' if the customer cancels in the first 30 days." Were we to consider this argument (*Owens*, *supra*, 49 Cal.App.5th at p. 746), we note that there is absolutely no basis to believe the Legislature separately required this cancellation provision to make it easier for insurance sellers to time their disclosures so that the customers cannot read the disclosures until after they have purchased credit insurance.

Again, for the first time in its reply brief, Adir contends the phrase "offer to sell" in section 1758.97 precludes the creation of a precondition in the dependent clause. It argues that requiring complete disclosure before an offer to sell defies common sense. Were we to consider this argument (*Owens*, *supra*, 49 Cal.App.5th at p. 746), we note Adir relies on a particular definition of "offer": a " ' " 'manifestation of willingness to enter into a bargain.' " ' " (See *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 271 (*Donovan*).) The full definition of "offer" in *Donovan* is " ' " 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " ' " (*Ibid.*) Given this definition, it is easy to see how the required complete disclosure could occur before an offer to sell is made. An agent could simply ask if the customer is interested in learning about

35

"account and product protection" (the term used on at least one Adir brochure) without providing any details. This would not justify the customer in understanding that an affirmative response would result in the purchase of such protection.[12] If the agent did receive an affirmation response, the agent could then make the disclosures required by section 1758.97, subdivisions (a) and (b) before consummating the sale.

This understanding is also consistent with the Legislature's purpose in enacting Insurance Code, Article 16: to protect consumers. Defendants' interpretation, by contrast, is more beneficial to sellers than to consumers. To adopt their argument, we would have to find the Legislature intended to benefit insurance sellers by permitting them to withhold relevant information about the insurance until after the sale is complete. We decline to so find.

Defendants contend that even if presale disclosure is required, the trial court "entirely failed to consider a significant change in Curacao's disclosure methods in December of 2020. At that time, Curacao transitioned all sales procedures to a contactless process, making enrollment available on a tablet or a smartphone." Defendants contend this process requires customers to read the disclosures *before* enrolling in AGP Plus. Defendants conclude this omission requires reversal.

---

[12] As the Supreme Court pointed out in *Donovan*, "The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances." (*Donovan*, *supra*, 26 Cal.4th at p. 271.)

36

The trial court may well have chosen not to discuss the contactless system because defendants provided no evidence of its complete contents. Put differently, defendants offered evidence that they had changed the format of their disclosure methods, but did not offer admissible evidence that the timing of the disclosures, as established by the People, had changed. Defendants' witness who testified about the contactless system relied on an exhibit which did not show all the pages (screens) of the system. When the witness tried to testify to the contents of the screens which were not shown in the exhibit, the People objected. The trial court ruled the witness could "testify to the general subject matter of the screens, just not any specifics."

III.   ***Tolling Agreement***

Defendants contend the trial court failed to apply the statute of limitations to exclude all violations that predate February 19, 2016 from its damage calculations. They acknowledge they entered into this stipulation of fact with the People: "The parties agreed to toll the four-year statute of limitations set forth in Business & Professions Code section 17208 with the effective date of May 20, 2016, which the parties agree extends the relevant period for the People's claims beginning May 20, 2012." Defendants contend, however, "[r]ead in context" this stipulation "has nothing to do with the timeliness of the Insurance Code claims. The stipulated fact simply reports on the existence of a tolling agreement that was in fact entered on May 20, 2016." Defendants argue the parties could not have agreed in 2016 to toll claims that did not yet exist. They also appear to contend that tolling is a legal issue, not a factual one.

Apart from Business and Professions Code section 17208, defendants cite no legal authority at all to support their claims.

For that reason alone, we find the claim waived. (*United Grand, supra*, 36 Cal.App.5th at p. 146.)

Assuming for the sake of argument that there is no waiver, we would choose to apply the doctrine of judicial estoppel and decline to consider this claim. " 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 (*Jackson*).) " 'The gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather, it is the intentional assertion of an inconsistent position that perverts the judicial machinery.' " (*Id*. at p. 183.) " ' "Judicial estoppel is 'intended to protect against a litigant playing "fast and loose with the courts." ' " ' " (*Id*. at p. 181.)

Application of the doctrine is discretionary. (*Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 735.) One reason to apply the doctrine is to " 'preclude[] a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.' " (*Ibid*., fn. omitted.)

The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Jackson, supra*, 60 Cal.App.4th at p. 183.) All of those requirements are satisfied here.

38

Defendants entered into a series of stipulated facts before trial.  In stipulated fact No. 30, they agreed to the position that tolling applied to the claims and violations to be adjudicated at trial.  The stipulation itself contains no limitations on the claims or violations covered by the tolling.  Even assuming for the sake of argument that the stipulation could be understood as referring to a separate written tolling agreement, nothing in the stipulation indicates that such an agreement contains any relevant limitations on the claims or violations covered by the agreement.

It is undisputed defendants entered into the factual stipulations in an attempt to shorten the projected length of the trial and obtain an earlier trial date.  This strategy was successful and they received an earlier trial date.

There is nothing to suggest defendants took this position out of ignorance, fraud or mistake.  At the time they entered into the stipulation, they knew the only claims remaining to be tried involved the predicate Insurance Code and Unruh Act violations for the UCL claim.  In addition to the tolling stipulation, defendants entered into three other stipulations of fact about evidence related to the People's insurance claims going back to 2012.  During trial, defendants continued to take the position that tolling applied to the claims on trial.  In opening statements, attorneys for defendants referred to "2012 until this year" as "the relevant time period of this case."  They also failed to object to evidence showing they had committed violations before 2016.

Shortly after trial, in their objection to the trial court's proposed statement of decision about the number of Insurance Code violations, defendants relied on the stipulation to support their objection without in any way indicating that the stipulation

39

was invalid or limited. It was only after the trial court issued its final statement of decision imposing a fine for each sale of a credit insurance policy that defendants changed their position on tolling and argued tolling did not apply to the insurance claims and violations. This position is totally inconsistent with their pretrial position. Given that about half of the fines arose from violations before 2016, defendants were clearly seeking a second advantage from this change of position.

IV.   *Azarkman's Personal Liability*

The trial court found Azarkman personally liable for Curacao's unlawful business practices "because he has complete control over those practices, he was aware of those unlawful business practices, and he has permitted those practices to continue. He is also liable for aiding and abetting Curacao's unlawful business practices."

More specifically, the trial court found: "The evidence showed that Ron Azarkman controls Curacao and has controlled the company for years. . . . Ron Azarkman is currently the sole owner of Curacao either directly or through entities he owns. . . . Mr. Azarkman and his personal trust have been the only two members of the LLC that runs Curacao and receive all of the company's distributions. . . . [¶] Ron Azarkman is also the Chief Executive Officer of Curacao and sits alone atop the entire corporate organization. . . . As the CEO, Mr. Azarkman sets the short- and long-term strategies of the company, sets the tone for and monitors the margins, and receives and reviews monthly profit and loss reports, balance sheets, and daily sales reports. . . . As he testified, Mr. Azarkman has 'the authority to do anything in the company.' "

40

As the trial court explained: "The principals or executives of a company are directly liable for the company's violations of the Unfair Competition Law where they have 'control over the operations of the business,' were 'informed' about the practices at issue, and permitted those practices to continue. (*People v. Toomey* (1984) 157 Cal.App.3d 1, 15; *People v. Conway* (1974) 42 Cal.App.3d 875, 886; *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 735; *People* [*ex rel. Harris*] *v. Sarpas* (2014) 225 Cal.App.4th 1539, 1564.) Actual knowledge of the unlawful practices is not required where the principal 'reasonably should have known' that the company engaged in the challenged acts or practices. (*People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119, 132.) [¶] Company principals and executives can also be held liable for aiding and abetting Unfair Competition Law violations. [Citations.] [¶] Because the Unfair Competition Law imposes strict liability, it is irrelevant for purposes of liability whether the principal or executive knew the conduct was illegal; it is sufficient to show that the principal or executive knew the conduct was occurring and permitted it to continue. (See *Hewlett*[ *v. Squaw Valley Ski Corp.* (1997)] 54 Cal.App.4th [499,] 520 [holding that where the defendant intended to cut down trees, 'the fact that it may have believed its conduct was lawful . . . is not a defense' to liability under the UCL's unlawful prong].)"

The trial court discussed Azarkman's long-standing knowledge of AGP sales structure: "Mr. Azarkman was aware that Curacao stores and associates had goals for services, which included the sale of credit property insurance and received sales reports that show credit insurance sales broken down by store. . . . Mr. Azarkman was also aware that Curacao attached

41

bonuses to those services goals." The trial court specifically found: "AGP was enormously profitable for the company and for Mr. Azarkman personally, and any contention that he wasn't aware that Curacao was paying commissions to its unregistered, unlicensed employees for the sale of credit property insurance is not credible."

This claim involves questions of law and the application of law to essentially undisputed facts. Our review is de novo. (*Ashford Univ.*, *supra*, 100 Cal.App.5th at p. 518.)

Azarkman contends the trial court erred in finding him personally liable for the UCL violations because a "defendant's liability must be based on his personal 'participation in the unlawful practices' and 'unbridled control' over the practices that are found to violate section 17200." (*Emery v. Visa Internat. Service Assn.* (2002) 95 Cal.App.4th 952, 960 (*Emery*), quoting *People v. Toomey*, *supra*, 157 Cal.App.3d at p. 15 (*Toomey*).) Azarkman contends he did not personally participate in the sale of AGP Plus and so cannot be held personally liable.

In *Emery*, the discussion involves whether a corporation (VISA) could be held liable for the acts of merchants with which it had no relationship and over which it had no control. (*Emery*, *supra*, 95 Cal.App.4th 952.) As the *Emery* court also noted, the evidence showed that VISA was unaware of the acts of these merchants. Unsurprisingly, the court found no basis to hold VISA liable. Given this factual context, the quotes in *Emery* from *Toomey* are at best dicta.

In *Toomey* itself, the court does refer to "personal participation" but it also clearly states: "His position in the corporation and operation of the business subjects him to liability for misleading solicitations made by his employees. (*People v.*

42

*Conway*, *supra*, 42 Cal.App.2d [at p.] 886.)" (*Toomey*, *supra*, 157 Cal.App.3d at pp. 14–15.) This reference to *Conway* comes immediately after the *Toomey* court had cited *People v. Conway* for the proposition that "it is settled that a managing officer of a corporation with control over the operation of the business is personally responsible for acts of subordinates done in the normal course of business. (*People v. Conway*[, at pp.] 885–886; *People v. International Steel Corp.* (1951) 102 Cal.App.2d Supp. 935, 942.) In [*People v.*] *Conway* the court found the evidence 'sufficient to show that appellant, . . . was in a position to *control* the activities of the dealership and thus could be held criminally liable for false advertising.' " (*Toomey*, at p. 15.)

Azarkman's reliance on *People ex rel. Harris v. Sarpas*, *supra*, 225 Cal.App.4th 1539 (*Sarpas*) and *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219 (*JTH Tax*) is similarly misplaced.

In *Sarpas*, one of the owners of the business claimed he could not be held liable because he did not personally participate in the calls or marketing scheme that were the basis of the UCL violations. The court stated: "Liability under the UCL . . . must be based on the defendant's participation in *or* control over the unlawful practices found to violate [Business and Professions Code] section 17200 or 17500." (*Sarpas*, *supra*, 225 Cal.App.4th at p. 1563, italics added.) The Court of Appeal agreed with the trial court that: " 'The evidence at trial established that Sarpas and Nazarzai were each active participants in the day-to-day operations of USHA, managed the business, jointly owned USHA, and split the profits from USHA. They are thus directly liable for the actions of the company and liable for their failure to prevent

43

the deceptive, illegal, and unfair acts of their agents, independent contractors, and employees.' " (*Ibid*.)

We are baffled by Azarkman's reliance on *JTH Tax*, a case which addressed whether a franchisor can be vicariously liable under an agency theory for its franchisees' illegal advertising. (*JTH Tax*, *supra*, 212 Cal.App.4th at p. 1243.) There are no such issues in this case.

Azarkman next presents a straw man argument contending that " '[K]nowledge of . . . operations' alone does not permit liability. (*Sea Horse Ranch, Inc. v. Superior* [*Court*] (1994) 24 Cal.App.4th 446, 457[, citing] *People v.* [*International*] *Steel Corp.*[, *supra*,] 102 Cal.App.2d [at pp.] Supp. [942–943].)" The trial court in no way premised its ruling on Azarkman's knowledge alone. The full quote from *Sea Horse Ranch* is consistent with the standard in this case: "the corporate secretary was found not liable; although he had knowledge of the burning operations, he had no control over them." (*Sea Horse Ranch*, at p. 457.)

Finally, Azarkman argues "no case has ever held that the second fact—that Azarkman was the chief executive of the company and generally controlled its operations—is enough to establish liability in the absence of evidence that the executive directed and personally participated in the specific unlawful program." It can be difficult to establish a negative, but it is worth noting Azarkman does not cite any cases supporting his claim that "general" control is not sufficient. Regardless, the trial court found far more than "general" control by Azarkman, as set forth above.

## DISCUSSION OF APPEAL BY THE PEOPLE

I.     *Unruh Act Fees*

The People contended defendants' sales of AGP[13] violated the Unruh Act, specifically Civil Code sections 1805.4 and 1810.4. They argued these two sections of the Civil Code permit holders of retail installment contracts or accounts to charge fees, expenses and other charges (collectively fees) specifically authorized by the Unruh Act.  The trial court concluded that defendants' practice of charging their credit customers for AGP did not run afoul of the Unruh Act.  It found that any Unruh Act limitation on fees applied only to fees included in the actual agreement between the parties which created the credit relationship, that is, the retail installment agreement, so that sellers were free to charge other fees, such as AGP, if the buyer agreed.  The People contend the trial court erred in so ruling.

As the appeal raises a question as to how these statutes apply to undisputed facts, our review is de novo.  (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384.)  We hold Civil Code sections 1805.4 and 1810.4 limit all permissible fees to only those specifically authorized by the Unruh Act.

The parties' disagreement centers on the meaning of the clause beginning with "no fee" in Civil Code section 1805.4, and the sentence beginning with "[n]o fee" in Civil Code section 1810.4.  Civil Code section 1805.4, which applies to installment contracts, provides in pertinent part: "The finance charge shall be inclusive of all charges incident to investigating and making the

---

[13]     References here to AGP include both AGP Basic and AGP Plus.

45

contract and for the extension of the credit provided for in the contract, and *no fee, expense or other charge whatsoever shall be taken, received, reserved or contracted for except as otherwise provided in this chapter.*"  (*Ibid.*, italics added.)  The section then goes on to permit a bad check fee of not more than $15.  (*Ibid.*)

Civil Code section 1810.4, which applies to installment accounts, provides in pertinent part: "The finance charge shall include all charges incident to investigating and making the retail installment account.  *No fee, expense, delinquency, collection, or other charge whatsoever shall be taken, received, reserved, or contracted by the seller or holder of a retail installment account except as provided in this section.*"  (*Ibid.*, italics added.)  That section then goes on to permit the same bad check fee allowed for retail installment contracts in Civil Code section 1805.4 as well as an attorney fee shifting agreement and an annual fee of not more than $15 for retail installment accounts for which a credit card is issued.  (*Id.*, § 1810.4.)

The trial court characterized the issue as follows: "The fundamental disagreement between the parties is whether both sections are only directed toward fees that are incident to investigating and making the contract and for the extension of the credit provided for in the contract.  If they are only directed toward fees that are incident to investigating and making the contract and for the extension of the credit provided for in the contract, the parties are free to voluntarily enter into other agreements that are not terms or conditions of extending credit.  If they are intended to be more expansive, AGP might be prohibited."

46

This issue framing relied upon an implicit assumption that the phrase "incident to . . . making the contract and for the extension of the credit provided for in the contract" refers to the terms or conditions of the initial retail installment agreement.

The trial court then found: "The limitation on 'no fee, expense or other charge' is in the same sentence as 'incident to investigating and making the contract.' By its plain terms, the provisions are related to each other and the 'no fee, expense, or other charge' language refers to 'charges incident to investigating and making the contract.' There is no indication by the plain terms that what the [L]egislature really meant was for 'no fee, expense or other charge' unrelated to 'charges incident to.' The statute restricts fees, expenses and other charges that are incident to investigating and making the contract."

The trial court then found its interpretation was "confirmed" by the language used to authorize the other fees or expenses. The trial court found that "[e]ach of these by their terms are related to 'contract' formation in that they would be agreements reached at the time credit was extended, but they cannot be included in the finance charge because they are unknown future charges."

As this quoted discussion shows, the trial court based its analysis almost entirely on Civil Code section 1805.4, which is quite similar to Civil Code section 1810.4, but not identical to it. Civil Code section 1805.4 uses the phrase "for the extension of the credit provided for in the contract" while Civil Code section 1810.4 does not. The "no fee, expense or other charge" provision in Civil Code section 1805.4 is part of one continuous sentence, while the provision in Civil Code section 1810.4 is used in a separate sentence.

47

The trial court did not discuss the absence of the phrase "extension of the credit" from Civil Code section 1810.4. This is a significant omission by the trial court, which relies heavily on the concept of "extending credit" in its analysis of the two sections.

The trial court did recognize that the "no fee, expense or other charge" provision was in a separate sentence in Civil Code section 1810.4,[14] but found that the provision was nonetheless "reasonably interpreted as related [to] the 'incident to' language." The trial court found that to interpret the provision otherwise would make it inconsistent with Civil Code section 1805.4 and canons of statutory interpretation which indicate that when the same words are used they should be interpreted consistently. (See *In re Marriage of Pinto* (1972) 28 Cal.App.3d 86, 89 [holding that "When statutes are in pari materia, the interpretation of similar phrases or sentences in one controls the interpretation of virtually the same phrases or sentences in the other" (italics omitted)].)

To reach its conclusion, however, the trial court did not rely on the meaning of the words in the "no fee, expense or other charge" provisions. It relied on the placement of that provision in the same sentence as the "incident to investigating and making the contract" language in Civil Code section 1805.4. There is no such same sentence placement on which to rely in Civil Code section 1810.4. Presumably, if the trial court had considered Civil Code section 1810.4 first, it would have had to reach a different conclusion as to the meaning of the "no fee, expense or other charge" clause, because that clause is found in a separate

---

14      More precisely, Civil Code section 1810.4 refers to "[n]o fee, expense, delinquency, collection, or other charge." (*Ibid.*)

48

sentence, and there is nothing in the text of the section to indicate the Legislature intended the sentences to be read together.

The trial court did not explain its rationale for giving primacy to the structure of Civil Code section 1805.4, and we see none. The two sections at issue are both found in the original bill as enacted and the structure of the relevant language has not changed since. They are essentially parallel provisions. Civil Code section 1805.4 discusses the finance charge and "no fee, expense or other charge" provision for retail installment *contracts*, while Civil Code section 1810.4 discusses it for retail installment *accounts*.

As was the case with Civil Code section 1805.4, the trial court also relied on the reference in Civil Code section 1810.4 to other fees being allowed "as long as they are 'provided in *this section*[,]' i.e. meaning within section 1810.4" to support its interpretation. In this case, the trial court found that the Unruh Act provided for "at least one other fee that is *not* in [Civil Code] section 1810.4: the cost of insurance ([Civ. Code,] § 1810.5)." (Boldface omitted.) The trial court concluded that to be consistent with Civil Code section 1810.5, Civil Code section 1810.4 must be read to restrict only fees, expenses and other charges that are incident to investigating and making the contract.

A. <u>Charges Incident to Investigating and Making the Contract</u>

The trial court and the parties focus on whether the phrase "charges incident to investigating and making the contract" applies to the "no fee, expense or other charge" provision. Put differently, the trial court found the phrases "no fee, expense or

49

other charge" and "[n]o fee, expense, delinquency, collection, or other charge" to be ambiguous and looked to the canons of statutory construction to interpret those phrases.[15]  The trial court apparently sees no ambiguity in the phrase "charges incident to investigating and making the contract" because the trial court provides no serious analysis of its meaning.  We view these two phrases differently.

As in any case involving statutory interpretation, "our primary task is determining legislative intent.  [Citation.]  In doing so, we 'look first to the words of the statute, "because they generally provide the most reliable indicator of legislative intent." '  [Citations.]  Where a statutory term 'is not defined, it can be assumed that the Legislature was referring to the conventional definition of that term.'  [Citations.]  We thus give the words in a statute 'their plain and commonsense meaning.' " (*Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement* (2011) 192 Cal.App.4th 75, 81–82.)

"The plain meaning controls if there is no ambiguity in the statutory language.  [Citation.]  If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " (*Cornett*, *supra*, 53 Cal.4th at p. 1265.)

---

[15]  We infer this ambiguity finding from the trial court's recourse, mentioned above, to the stated extrinsic aid of in pari materia which is appropriate if a statute is ambiguous.  (See *Yassin v. Solis* (2010) 184 Cal.App.4th 524, 536.)

Although the trial court does not reference it, the trial court appears to be applying the doctrine of *noscitur a sociis* (it is known by its associates), which is the principle that " ' "the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used." ' " (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 14.) However, that principle is "applicable to terms that are 'associated' by grouping or serial enumeration in the same phrase or clause, not to terms that are set apart in different clauses for apparent disparate treatment." (*Texas Commerce Bank v. Garamendi* (1992) 11 Cal.App.4th 460, 473 (*Texas Commerce*).) The principle does not apply when a statute "sets the two terms apart in separate clauses with different qualifying phrases." (See *id.* at pp. 473–474.)

The latter situation is the one present here. Even if we were to treat Civil Code section 1805.4 as using a serial enumeration of permissible charges under the Unruh Act, this section clearly places this enumeration in two separate clauses with different qualifying phrases. The first clause uses inclusionary language ("shall be inclusive" and "all charges") while the second clause uses exclusionary language ("no fee . . . except"). The language shift alone creates a dichotomy. The statute gives disparate treatment to the two clauses. The first clause lists a specific component of a specific permissible charge (the finance charge), while the second clause refers the reader to other sections of the Unruh Act to determine the nature and components of the other (unspecified) permissible charges. Again, they are dichotomous.

51

For similar reasons, we do not find applicable the doctrine of *ejusdem generis*, as suggested by defendants. That doctrine instructs that when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. (*In re Corrine W.* (2009) 45 Cal.4th 522, 531.) It generally does not apply when there are two clauses that are dichotomous. (See *Texas Commerce, supra,* 11 Cal.App.4th at pp. 472–473.) In contrast, "[c]ases typically apply *ejusdem generis* to phrases that enumerate several specific items followed by a general reference to 'other . . .' or 'other materials . . . .'" (*Id.* at p. 473.) Here, the "fees, expenses and other charges" are not "general words" as defendants claim; they are explicitly given a specific meaning in other parts of the Unruh Act. Similarly, "finance charge" has a fixed definition elsewhere in the Unruh Act, in Civil Code section 1802.10. There is no reason to ignore these other sections limiting, defining and/or describing fees and charges simply because the fees and charges are listed together in one section.

To put the matter in more everyday terms, if a cookie shop had a menu stating that all chocolate chip cookies shall be made with walnuts and no cookies will be sold except as listed on the menu, a reasonable customer would not expect that all cookies on the menu were made with walnuts. The customer would look at the menu to determine the ingredients of the other cookies.

A more fundamental problem with the trial court's interpretation is that the trial court does not consider what the phrase "charges incident to investigating and making the contract" means. We find that to be the ambiguous phrase, not the "no fee" phrase. What would "investigating . . . the contract"

52

mean?  How does one investigate a document?  The most likely meaning is investigating the prospective buyer's creditworthiness, but that is an indirect way of phrasing it.  The verb "to make" is often used in connection with the creation of something physical, indeed as a synonym of create or produce, and so could refer to the act of creating a physical (or digital) contract document.  In the law, "making" a contract very often refers to the last act necessary to validate the contract, that is acceptance.  (See, e.g., *C.H. Parker Co. v. Exeter Refining Co.* (1938) 26 Cal.App.2d 610, 612–613.)  What costs would be incident to a buyer's acceptance of the contract?

These ambiguities make it appropriate to refer to the legislative history of the Unruh Act.  (*Cornett, supra,* 53 Cal.4th at p. 1265.)

Both sections were included in the original enactment of the Unruh Act and have remained essentially unchanged since. Thus, we consider first the legislative history of the original enactment of the Unruh Act.

B.     Legislative History of the Finance Charge Structure

The "charges incident to investigating and making the contract" are part of the finance charge, and so we look to the history of the finance charge.  As originally enacted, the Unruh Act imposed specific limits on the amount of a finance charge, then referred to as a service charge.  Civil Code section 1805.1 specified the maximum service charge a seller could charge for a retail installment *contract* as percentages of the balance owed, with minimum charges defined in dollars.  Civil Code section 1810.4 did the same for retail installment *accounts.*

Both the preliminary and final reports of the Subcommittee on Lending and Fiscal Agencies for the Unruh Act recognize that

53

sellers incur administrative costs in creating the credit relationship and the documents memorializing that relationship. The preliminary report states: "Realizing that certain administrative costs are incurred in negotiating and establishing accounts which would not be defrayed in contracts of small amount or short maturities by the foregoing rates, this committee recommends minimum credit service charge rates of $12 for contracts with maturities of more than eight months, and $10 if the contract has maturities of eight months or less." (Assem. Interim Com. on Finance and Insurance, Preliminary Rep. of Subcommittee on Lending and Fiscal Agencies (Mar. 1958) 15 Assem. Interim Com. Rep. (1957–1959) No. 19, p. 12, Appen. To Assem. J. (1958 Reg. Sess.) (Assembly Interim Committee Preliminary Report).) Relatedly, for revolving accounts, the report recommended allowing a rate of 1.5 percent for the first $1,000 of the balance and a rate of 1 percent for the portion of the balance over $1,000. (*Id.* at pp. 12–13.) The term "credit service charge" was later shortened to service charge. This rate structure was reflected in Civil Code sections 1805.1 and 1810.3 of the proposed bill attached to the preliminary report. (Assem. Interim Com. Preliminary Rep., at pp. 24, 29.)

The final report also discusses the administrative costs of establishing accounts: "The merit in a rate schedule which reduces as the amount being financed increases, lies in the fact that the transaction cost of handling is no greater on a contract for more than $1,000 than it is on a contract for only $100 except for the cost of investigating the buyer's credit standing. . . . [¶] . . . [¶] Minimum rates are provided by [Civil Code] [s]ection 1805.1[, subdivision] (c) for the purpose of absorbing acquisition costs, which include the costs of credit investigation and

processing the documents involved in setting up the account."
(Assem. Interim Com. on Finance and Insurance, Final Rep. of
Subcommittee on Lending and Fiscal Agencies (Mar. 1959)
15 Assem. Interim Com. Rep. (1957–1959) No. 22, p. 18, Appen.
To Assem. J. (1959 Reg. Sess.) (Assembly Interim Committee
Final Report).)  Civil Code section 1810.3 of the attached
proposed bill also reflected this rate structure.

Civil Code sections 1805.1 and 1810.3 were adopted intact
from the draft proposed bill attached to the final report.  (Civ.
Code, § 1810.3 was renumbered as Civ. Code, § 1810.4.)

To summarize: the drafters intended for sellers to be
compensated for the costs of negotiating, investigating buyers,
and setting up accounts through the structure of the service
charge (now called the finance charge).  This purpose would
generally be unknown to most sellers, who are unlikely to have
obtained and read the subcommittee reports.

Thus, we conclude that the statement "finance charge . . ."
is simply an explanation that the administrative costs of setting
up the agreement between the parties are (literally) included in
the finance charge.  Put differently, the administrative costs of
setting up the agreement cannot be separately charged by the
seller in addition to the finance charge, the purpose of which is to
compensate the seller for these costs.

Given that the phrase "investigating and making the
contract" does not refer broadly to setting the terms and
conditions of the retail installment agreement, the phrase cannot
function to restrict the "no fees clause" only to fees specifically
included in the retail installment agreement.

C.    "Extension of the Credit Provided"

The trial court relied heavily on the phrase "extension of the credit provided for in the contract" in the phrase "all charges incident to investigating and making the contract and for the extension of the credit provided for in the contract."  The trial court concluded that phrase referred to the initial decision to extend credit to a buyer and so related to the original terms and conditions of the retail installment agreement.  The phrase "extending credit" can mean providing credit.  Here, however, the phrase refers to credit "provided for in the contract."  If the credit was provided for in the contract, what charges would be incident to actually extending the credit?  And, as we have noted, the trial court did not consider the omission of the phrase from Civil Code section 1810.4.  We find the phrase ambiguous in its context.  Accordingly, we refer to the legislative history.

Although the phrase has been in Civil Code section 1805.4 since the first proposed draft bill attached to the preliminary report, there is no discussion of the specific phrase "extension of the credit" in either the preliminary or final report.  There is also no discussion in the legislative history of the omission of the phrase from Civil Code section 1810.4.

The only reference in the reports to extending "credit" is a passing one in a section of the final report entitled "GENERAL STATEMENT AND OBSERVATIONS."  (Assem. Interim Com. Final Rep., *supra*, at p. 12.)  The report observes: "It is a time-honored principle that consumer credit should be extended to those who are entitled to it."  (*Ibid*.)

In contrast, the "extension" with which the subcommittee was concerned was the extension of payments.  There are several references to abuses of sellers in connection with such extensions

56

in the reports.  The reports, however, do not use the word "credit" in these discussions.[16]

The drafters did place a provision in both proposed draft bills and in the enacted bill which governs the extension of payments.  As enacted, Civil Code section 1807.1 provided: "The holder of a retail installment contract may, upon agreement with the buyer, *extend* the scheduled due date or defer the scheduled payment of all or of any part of any installment or installments payable thereunder."  (Civ. Code, § 1807.1, subd. (a), italics added.)  "[T]he agreement for such *extension* or deferment must be in writing and signed by the parties thereto."  (*Ibid.*, italics added.)

Understanding "extension of the credit provided" as referring to extension of payments under Civil Code section 1807.1 would explain the omission of the phrase from Civil Code section 1810.4.  That section is concerned with retail installment *accounts*.  Civil Code section 1807.1 permitted the extension of payments for retail installment *contracts*.  Thus, it would make

---

[16]    In the preliminary report, one of the 12 concerns identified by the drafters used the term extension: "Arbitrary and unregulated charges for payment extensions."  A second concern uses the word extended: "Failure to properly credit the customer with the unearned portion of the finance charge when contracts are extended, consolidated or when subsequent purchases are added to an existing contract."  (Assem. Interim Com. Preliminary Rep., *supra*, at p. 7.)  In the final report, the word extension appears only in the following section, again as an area needing protection: "REFINANCING AND EXTENSIONS [¶] Charges for such arrangements are provided in connection with installment contracts, with limitations on the rate of charge."  (Assem. Interim Com. Final Rep., *supra*, at p. 11.)

sense for the phrase "extension of the credit" to appear in Civil Code section 1805.4, which applies to retail installment contracts, and not in section 1810.4 which applies to retail installment accounts.

This understanding of "extension of the credit provided" would refer at most to one component of one charge in a retail installment agreement. Like the "*investigating* and making" charge, it does not refer to or encompass all the terms and conditions of that agreement. Thus, it cannot limit the no fee clauses to those terms and conditions provided in that agreement.

D.    Sections Referenced in Civil Code Sections 1805.4 and 1810.4

To support or confirm their interpretation of the phrase "charges incident to investigating and making the contract," the trial court and defendants rely on the code sections referenced in the "no fee, expense or other charge" clause of Civil Code section 1805.4 and what they believe are conflicts between the restriction of Civil Code section 1810.4 to fees etc. provided "in [that] section" and two other sections. We have rejected that interpretation. We do not find that the limitations in Civil Code sections 1805.4 and 1810.4 render the "no fee" provisions ambiguous.

1.    *Civil Code Section 1805.4*

The trial court relied on the code sections which are referenced in the "no fee, expense or other charge" clause to "confirm" its interpretation of the "charges incident to investigating and making the contract" clause.

58

The trial court noted: "[Civil Code] [s]ection 1805.4 specifically allows retailers to contract for other fees or expenses that are 'provided in this chapter.' The other expenses allowed for in the chapter are: a delinquency charge that is included in the contract ([Civ Code,] § 1803.6 ['a contract may provide']), dishonored check fee 'in connection with' the contract ([Civ Code,] § 1805.4 ['issued in connection with the retail installment contract']), and cost of insurance if any 'is included in the contract' ([Civ Code,] § 1803.5). Each of these by their terms are related to 'contract' formation in that they would be agreements reached at the time credit was extended, but they cannot be included in the finance charge because they are unknown future charges."

Only two of the three provisions require the fee to be included in the contract. We see no requirement that the dishonored check fee be agreed to by the parties and included in their contract; the section simply states it authorizes the "seller or holder of a retail installment contract may charge and collect a fee." (Civ. Code, § 1805.4.) The only limitation is that the check be issued in connection with the retail installment account. Thus, the trial court's reasoning that this provision is ambiguous is not persuasive.

### 2.     *Civil Code Section 1810.4*

As we mention above, the trial court found an anomaly when it compared Civil Code sections 1810.4 and 1810.5. Civil Code section 1810.4 limits fees to those allowed in that section (that is in section 1810.4 itself), but Civil Code section 1810.5 permits the buyer to be charged for insurance. The trial court found the only way to "harmonize" these two sections was to limit the "no fee" provision in section 1810.4 to fees and other charges

59

contained in the retail installment agreement.  Thus, in the trial court's view, all other (later or separate) fees, including for insurance, would be permitted.

We do not think this solves the problem.  Civil Code section 1810.5 requires conformance with Civil Code section 1803.5 and Civil Code section 1803.5 permits the cost of insurance to be included in the contract.  We also find the People's explanation more persuasive.

The Unruh Act was prompted by and intended to curb abusive practices by retail installment sellers and finance companies.  The Legislature found buyers suffered "ill treatment at the hands of installment sellers or finance companies." (Assem. Interim Com. Final Rep., *supra*, at p. 9.)  Sellers engaged in "harsh practices," including "excessive amounts [being] exacted from the consumer" in finance charges, delinquency and collection charges in "whatever amount the traffic will bear," and attorney fees and court costs charged to the debtor's account "although they are not always actually incurred and are not always paid over to an attorney."  (*Id*., at pp. 9–10.)

Civil Code section 1810.4 provides: "No fee, expense, delinquency, collection, or other charge whatsoever shall be taken, received, reserved, or contracted *by the seller or holder of a retail installment account*."  (*Ibid*., italics added.)  This provision provides limits on a seller who is taking, receiving, reserving or contracting for the seller's own retail installment account, which is consistent with the Legislature's intent to curb excessive or fictitious charges by sellers.

Under Civil Code sections 1810.5 and 1803.5, the seller is not taking, receiving or reserving a fee for the seller's retail installment account.[17] Civil Code section 1803.5, incorporated by reference into Civil Code section 1810.5, provides that "[t]he amount, included for such insurance, shall not exceed the premiums chargeable in accordance with rate fixed for such insurance *by the insurer*." (Civ. Code, § 1803.5, subd. (b), italics added.) Thus, we agree with the People that Civil Code section 1810.5, together with Civil Code section 1803.5, permits passing through actual costs of insurance provided by a third-party insurer. We note that Civil Code section 1803.5 requires the seller to provide a copy of the insurance policy to the buyer. Again, the seller is acting as a conduit between the insurance provider and the buyer. Sellers acting as conduits do not present the same potential for abuse as sellers acting for their own account.

Reading Civil Code section 1810.4 as restricting only amounts set and retained by the seller or holder for its own account harmonizes these two statutes without creating an internal conflict. (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 ["Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible."].) It also honors the manifest legislative purpose and heeds our Supreme Court's admonition

---

[17] It is true that there must be an agreement between the seller and the buyer concerning the insurance, but again, the seller is not contracting for a fee for his own account. The contract is fundamentally between the insurer and the buyer: the insurer provides insurance in exchange for a premium from the buyer.

that the provisions of the Unruh Act "should be liberally construed to protect consumers, with a view toward expanding, rather than limiting, its coverage." (*King v. Central Bank* (1977) 18 Cal.3d 840, 846.)[18]

Defendants contend a potential conflict exists between Civil Code sections 1810.4 and 1810.12. "Subdivision (b) of [Civil Code] [s]ection 1810.12 states that a buyer and seller may enter into a separate 'written extension or deferral agreement,' which may provide for the 'costs of collection.' ([Civ. Code, ]§ 1810.12, subd. (b).) Those 'costs of collection' are a 'fee, expense, delinquency, collection, or other charge,' but they are not 'provided in' [Civil Code] [s]ection 1810.4. So if [Civil Code] [s]ection 1810.4 governed agreements separate from the retail installment agreements, it would prohibit the 'costs of collection' authorized by [Civil Code] [s]ection 1810.12. Again, the Unruh Act should not be interpreted to bar the charges that it elsewhere allows."

Civil Code section 1810.12, subdivision (a), permits a seller to collect delinquency charges otherwise prohibited by Civil Code section 1810.4 "[n]otwithstanding" that section. (Civ. Code, § 1810.12, subd. (a).) Civil Code section 1810.12, subdivision (b) permits a seller to charge certain collection costs without acknowledging section 1810.4's limitations or using the word "notwithstanding." (Civ. Code, § 1810.12, subd. (b).) Most of subdivision (b) provides specifics of the delinquency charges

---

[18] The possibility, raised by defendants, that the seller might obtain a commission from the insurance company does not undermine this analysis. Insurance is regulated by other statutes.

which may be collected under subdivision (a); it is only the last sentence which refers to collection costs.  Given the general continuity of subject matter, it would be reasonable to understand the "[n]otwithstanding Section 1810.4" as also carrying over to subdivision (b).  (*Id.*, subds. (a), (b).)

Alternatively, legislative history suggests that this was an oversight as the Legislature understood the delinquency charges and collection costs were both restricted by Civil Code section 1810.4, and by adding Civil Code section 1810.12 "notwithstanding [Civil Code section 1810.4], a seller or holder of a retail installment account [would be permitted to charge] delinquency *and collection* charges identical to those prescribed for installments in default under a retail installment contract." (Legis. Counsel's Dig., Sen. Bill. No. 1037 (1983–1984 Reg. Sess.) 1983, Summary Dig., p. 258, italics added.)  But we need not rely on legislative history alone.  As a later enactment, to the extent of any conflict with Civil Code section 1810.4, Civil Code section 1810.12 controls.  (See *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960 [when interpreting conflicting statutes that cannot be reconciled, later enactments supersede earlier ones, and more specific provisions take precedence over more general ones].)

E.    Civil Code Sections 1805.4 and 1810.4 Limit Fees

Both Civil Code sections 1805.4 and 1810.4 use the word "whatsoever" in their "no fee" clause.  Civil Code section 1805.4 states "no fee, expense, or other charge whatsoever," while Civil Code section 1810.4 states "[n]o fee, expense, delinquency, collection, or other charge whatsoever."

63

The word "whatsoever" has been interpreted as absolute and all-encompassing. In *City of Carlsbad v. Insurance Co. of State of Pennsylvania* (2009) 180 Cal.App.4th 176, an insurance policy that excluded coverage for any property " 'damage arising out of land subsidence for any reason whatsoever' " was interpreted to mean the exclusion clause barred coverage "for all property damage caused by the landslide, regardless of the cause." (*Id.* at pp. 181–182.) In *Subsequent Injuries Fund v. Industrial Accident Commission* (1963) 217 Cal.App.2d 322, the court described a statute reducing compensation to injured workers by other "payments 'from any source whatsoever. . .' " as using the "broadest possible language" to reach all payments for conditions for which the state fund was otherwise liable. (*Id.* at p. 329; see also *id.* at p. 331 [" '[From] any source whatsoever' means just that."].)

Here, the plain and commonsense meaning of the prohibition on unauthorized "fee[s], expense[s], delinquenc[ies], collection[s], or other charge[s] whatsoever" and unauthorized "fee[s], expense[s] or other charge[s]" is that only those charges authorized in Civil Code sections 1810.4 and 1805.4 are allowed, to the exclusion of all others. Put differently, because credit/account protection fees are not authorized in Civil Code section 1810.4 or in Chapter 3 of the Unruh Act (for Civ. Code, § 1805.4), they are not permitted.

The legislative history of Civil Code section 1810.4 confirms this understanding. In 1982, the Legislature amended Civil Code section 1810.4 to allow retail creditors to charge annual fees on credit card retail installment accounts. (Sen. Bill No. 1366 (1981–1982 Reg. Sess.).) Such an amendment was necessary, according to the analysis by the Senate Democratic Caucus of

64

Senate Bill No. 1366, because "[e]xisting law relating to retail installment accounts provides that, except as specified, no fee, expense, delinquency, collection, or other charge whatsoever shall be taken, received, reserved, or contracted by the seller or holder of the retail installment account."  (Sen. Democratic Caucus, 3d reading analysis of Sen. Bill No. 1366 (1982–1983 Reg. Sess.) as amended Apr. 19, 1982, p. 1.)  The Senate Republican Caucus of Senate Bill No. 1366 agreed an amendment was necessary to permit retail installment account holders to impose annual fees because existing law provided that " '[n]o fee, expense . . . or other charge whatsoever shall be taken, received . . . (except) attorney's fees and (court) cost[s.] . . .' "  (Sen. Republican Caucus, analysis of Sen. Bill No. 1366 (1982–1983 Reg. Sess.) p. 1.)  The enrolled bill report by the Business, Transportation and Housing Agency recommended the Governor sign Senate Bill No. 1366.  (Business, Transportation & Housing Agency, Enrolled Bill Rep. on Sen. Bill. No. 1366 (1982–1983 Reg. Sess.) June 24, 1982 (Enrolled Bill Rep.).)  Enrolled bill reports are legislative history that may be considered by courts in construing a statute.  (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19.)  The enrolled bill report here explained: "Existing law relating to retail[] installment accounts specifies the maximum charges which may be exacted by a seller. The law does not provide for a credit card membership fee when a credit card is issued in connection with a retail installment account.  This bill would permit such a fee." (Enrolled Bill Rep., *supra.*)

Defendants contend such an interpretation is contrary to the legislative history of the bill, noting that Assemblyman Unruh told his colleagues that "[t]he purpose of this legislation is to protect the consumer when he purchases goods or services on

an installment plan." (Assemblyman Jesse M. Unruh, Proposed Retail Installment Sales Law, Assem. Bill No. 500 (Unruh Memo).) The "major problems of disclosure," Assemblyman Unruh explained, "lie in the methods used to obtain contracts." (*Ibid*.) So "[t]he provisions of [the Unruh] Act are designed to require full disclosure of all pertinent details of the transaction" through which an installment agreement is obtained. (*Ibid*.) Assemblyman Unruh's explanation could not have been clearer that the concern of the Unruh Act was the "purchase[]" of credit, not separate negotiations or agreements between the parties.

We do not read his comments so narrowly. Assemblyman Unruh continued that an Assembly investigation had uncovered "many abusive practices," including "non-disclosure of terms and conditions and of excessively high finance charges." (Unruh Memo, *supra*.) In discussing finance charges, he expressed an intent to prohibit exaction of "unconscionably high charges" by "unethical business concerns." (*Ibid*.) An interpretation of Civil Code section 1810.4 as limiting the universe of charges the seller or holder may impose on a retail buyer in the whole course of their creditor-debtor relationship is consistent with this purpose. There is no suggestion in Assemblyman Unruh's comments that a new form of abusive creditor practices or unconscionably high charges should be allowed if introduced any time after the moment of sale. By definition, an installment purchase creates an ongoing relationship. "[P]rotect[ing] the consumer when he purchases goods or services on an installment plan" requires restricting the universe of charges that may be imposed over the course of that relationship. (Unruh Memo, *supra*.)

66

Further, the subtext of defendants' argument is that the Legislature was concerned only with the formation of the retail sales agreement at the moment of purchase because that is when the seller wields the most power over the buyer and can use that leverage to get the buyer to agree to terms favorable to the seller. Neither Assemblyman Unruh nor the Legislature was that naive. As the preliminary and final reports show, many sellers were *tricking* buyers into accepting unfavorable terms using a variety of methods, including getting buyers to sign blank contracts or contracts with very small type or faint text. The final subcommittee report identified "misleading advertising and selling methods [and] overselling" as problems as well. (Assem. Interim Com. Final Rep., *supra*, at p. 13.) Trickery and overselling are not unlimited to the moment of purchase or point of sale.

While the final subcommittee report and bill were limited to specifically remedy the abusive practices identified at the time of the subcommittee's investigation and report, the report does not claim that these are all the possible abusive or "harsh practices" being used by sellers. Indeed, the report specifically states that the identified abuses are the "major types of harsh practices" uncovered by the investigation. (Assem. Interim Com. Final Rep., *supra*, at p. 9.)

We hold that the "no fee" provisions of Civil Code sections 1805.4 and 1810.4 bar all fees not specifically authorized (and regulated) by the Unruh Act for retail installment purchases. This holding is consistent with preventing sellers from avoiding the limitations of the Unruh Act and tricking buyers with whom they have a retail installment agreement into agreeing to new fees related to that agreement. It reduces, and perhaps

67

eliminates, the need for the Legislature to amend the Unruh Act every time a seller thinks of a new service that takes advantage of buyers.

We note that during the pendency of this action, defendants were apparently considering new ways to obtain fees from buyers. Defendants contend that our interpretation of the Unruh Act "would foreclose [(as the trial court explained)] 'the possibility of umbrella-type products or services that would benefit consumers and were never contemplated by the Legislature, including not only debt protection, but also interest rate-lock agreements, price protection . . . , credit monitoring, or identity protection.' "

Neither the trial court nor defendants have offered any details of these products or services, or explain what they mean by the term "umbrella-type." Without specifics, we cannot determine whether the services would benefit consumers. We can state that some of these services are currently available for free, and would not be impacted by a bar on unauthorized fees. Other services are not typically offered by retail sellers and would not be impacted by this opinion.

In the absence of an explanation from defendants, we take judicial notice of the fact that "interest rate lock" is a term commonly used in connection with mortgages, and lenders do not typically charge a fee for them. Retail installment sales have none of the key characteristics of a residential mortgage, and it is difficult to see how an interest lock would benefit a retail installment purchaser. Of course, retail installment sellers such as Adir remain free to emulate mortgage lenders and offer an interest rate lock for free, as an incentive for customers to make a purchase with them. We also take judicial notice of the fact that

price protection provisions are typically offered as a free benefit by credit card issuers. Retail installment sellers could do the same. We take judicial notice of the fact that some retail sellers, such as Target and Nordstrom, offer price adjustments or price matching for free to all customers regardless of the form of payment. Retail installment sellers such as Adir could adopt a similar free policy. Retail installment sellers would not be authorized to charge a fee for these products or services, but given that the market does not currently charge for these products or services and they are common, we see no basis to be concerned that this opinion, which bars some fees, will harm consumers.

As for the vaguely worded "credit monitoring" and "identity protection" services, we take judicial notice of the fact that such services seem to be provided by specialized entities such as LifeLock and Experian. These entities are not retail sellers and are not covered by the provisions of the Unruh Act at issue in this case. Interested consumers will still have access to these services. Nothing in this opinion would prevent Adir or other retail installment sellers from informing their customers about the existence of current credit monitoring and identity theft protection programs offered by others.

## DISPOSITION

The judgment in favor of Adir and Azarkman on the Unruh Act claim is reversed and remanded to the trial court for further proceedings. In all other respects, the judgment is affirmed. Costs are awarded to the People.

**CERTIFIED FOR PUBLICATION**


STRATTON, P. J.

We concur:


WILEY, J.


VIRAMONTES, J.